Good morning. I'm Alan Schroeder. I am the attorney for the plaintiff and the appellant, Ken Buckingham, who's sitting in the front row and wanted to listen to the oral arguments this morning. This case is similar to the last case in that it involves 100 percent cancellation of a permit. What is different from the last case is that this case deals with the revocation of a 2005 permit, which was a renewed grazing permit, and various violations of processes that the Forest Service did in implementing that cancellation. The first one and the first issue that we're dealing with is the 2005 permit. And the Forest Service, in their response to brief at page 19, admits that it must presume the terms of the 2005 permit as to the area and as to the fence maintenance. And if it can't presume that, it agrees that it cannot show noncompliance. Are you arguing that you didn't know what area you were supposed to be grazing your Mr. Buckingham was supposed to be grazing his cattle in? I don't think. What fences he was supposed to maintain? I don't think, Mr. ---- I think there is some question as to the fences he was supposed to maintain. No, no, no. I'm just, I just want to make, is this the argument that you're making to us now? No, no. I, I, the argument I'm making to you now is what is in the 2005 permit? The Forest Service is, is obligated to issue the permit. It has the discretion to add or subtract or modify those terms at its discretion. And in 2005, it did so and prescribed certain terms. And in those terms, it omitted any terms as to specific areas of use and as to any maintenance. So you are arguing that Mr. Buckingham didn't know in 2005 where the boundary lines ran for the allotments and what fences he was obligated to maintain? No, I don't want to, I don't want to deceive the Court in suggesting that. It's not a question of deception. I just don't understand your argument. My argument in a nutshell is this. Certainly, Mr. Buckingham had been a permittee on the buttermilk allotments since 1983. Certainly, Mr. Buckingham knew where the lye pasture area of the buttermilk allotment was and where the Blackridge area and where the buttermilk meadow area is. The question is, is not what he knew. The question is, is what did the 2005 permit prescribe? So is the Counsel, are you arguing that when the Forest Service called him many, many times, your cattle are in the buttermilk allotment or the burn area where they're not supposed to be, that he didn't know that they weren't supposed to be there because it wasn't specifically listed in the 2005 permit? Is that the argument? No. I think the question is twofold. I mean, the answer is twofold. The answer is certainly Buckingham knew. He knew these areas. I'm not going to sit here and tell you that Buckingham didn't know these areas. You'd have a hard time convincing me of that. What I'm trying to convince you of is it's the Forest Service that issued the 2005 permit. It's the 2005 permit that they're coming and issuing and saying you violated this permit when you had cattle out of place, out of area, or you didn't maintain it. Did you raise this issue at the administrative level? Yes. I believe yes in the context of the Native Ecosystems case that this Court has ruled upon. But you argue that that changed Idaho's sporting congress. Those cases were decided the same day by the same people. It's a little unlikely that one would have altered the other, don't you think? Well, I don't know what the Ninth Circuit would say about that. Certainly, I've got to say that that is the seminal cases on this that both the Forest Service and us as well as the District Justice decided. Just for discussion purposes, let's just say that you did not exhaust this. You have to go back to the administrative agency, right? We can't really help you if we construe those cases in the way that I just mentioned. If you construe the cases so that we have exhausted, then according to the Forest Service's own admission in their responsive brief, they can't demonstrate a lack of compliance. And if it's non-exhausted, which I think is what Judge Smith asked, if it's non-exhausted? Oh, if it's non-exhausted. Thank you, Judge. I misunderstood. If it's non-exhausted, you don't have that issue, right? If we have exhausted the issue, thank you. If we have exhausted the issue, I believe this Court can simply say it's reversed. However, I would understand, I think it's under that Chainley case or something that is cited in the briefing, that a remand would be appropriate for the Forest Service to then look at the face of the 2005 permit. Just for purposes of our discussion, let's assume for a minute that you did exhaust the administrative remedy. You're familiar with the Meadow Green case that then-judge Stephen Breyer and the First Circuit decided? Are you familiar with that? No, I'm not. It basically construed these types of land permits as basically contracts. They basically followed the law of contract. Would that make sense to you, that that's what we're dealing with here? No, for two reasons. The Ninth Circuit in the Osborne case has said that the- Very, very, very old case dealing with now a regulation that's long been overturned, right? Understood. But that certainly is a precedent of the Ninth Circuit, which has said that it will not apply contract principles to a permit. The second reason is that, and really it's the flip side of two on the second reason. The first one, as we advanced in our briefing, is that the 2005 permit, you look at the four corners of the permit, the parole evidence rule applies. We're not suggesting there's any ambiguity in that. We're also not suggesting that it no- Of course you're saying there's ambiguity. That's the whole basis of your argument, isn't it, is that the contract didn't have the attachments, it wasn't clear, and therefore you really can't enforce them. But then we get to this concept, and that's the reason I ask you about the contract concept. There is a course of dealing that people have. Merchants deal with one another. This isn't a commercial code case, but say that it were. You know, people deal with each other. Your client has dealt with the Forest Service for a great deal of time. They know each other. They know these areas and so on. So even if the contract had said nothing specific about it, don't you have a problem in arguing when everybody knows what the terms mean, even if there's no map attached? Isn't that really what we're talking about here? Well, yes, that's what we're talking about here, but I wouldn't concede that the course of dealing provides the answer to it, because even in the supplemental excerpts of record that the Forest Service put together where they riddled you with every annual operating instruction going way back, you go through each one of those, and each of them, I wouldn't say each is different from the other, but they evolve over time. They change. And so the question is, what would be the course of dealing as we sit here in 2005? A course of dealing doesn't mean everything in the relationship. But, for example, the definition of where these properties were, that certainly is consistent, right? Whatever else was changed, these properties and what each one meant was pretty clear. I mean, I would say if you look at the maps, they evolved because of the fence structure and the fence construction that occurred over the years. And your client did not know from day one where the buttermilk allotment was. I'm sorry, Your Honor. I meant it in the context of the particular areas, or sometimes they'll call pastures, within the buttermilk allotment. The buttermilk allotment has evolved to a point now where you had the lye pasture, in a sense, on one side of the west side of the allotment, and you had the Black Ridge on the west side, and then you had the buttermilk that happened to have the same name in the middle and the buttermilk meadows on the bottom. But those evolved and changed with the construction of different fences over time. Counsel, I'd have a lot more sympathy for your argument if I didn't have before me in the records such a pattern of repeat violations. The Forest Service kept finding the cattle in the same places that Mr. Buckingham wasn't supposed to be grazing them. They called him repeatedly and told him to move, and then they kept finding some of his cattle back in those same places. Even without regard to your technical argument that it wasn't specifically delineated in the 2005 permit, why is it arbitrary and capricious for the agency to look at that pattern of recidivism and conclude, as the agency did, that Mr. Buckingham wasn't doing a very good job of managing his cattle? Well, I wouldn't suggest that we're dealing in the issues that we're advancing here, except perhaps on the 558C argument that we're dealing with the arbitrary and capricious action. I believe the standard review is de novo, and then we're dealing with legal violations that occurred. But when I got into the question. Answer my question. Yes. The question is why. And so that is what. Why what? Why are they there? The answer is that this is an area about 53 square miles. This is an area where he was authorized 824 head with calves, so we're talking about 1,600 head of cattle. And so we're dealing with fence maintenance. If you assume to accept the presumed map that they want to do, we're dealing with very many pasture boundaries, fences that are not the responsibility of Mr. Buckingham, and the record reflects that there were repeated failures and ultimate failures by the existing permittee and neighboring permittees about their lack of maintenance. And so is your argument, yeah, I know Mr. Buckingham's cattle were grazing where they weren't supposed to be on multiple occasions. But everybody's cattle were grazing in places where they weren't supposed to be on multiple occasions. And everybody's at fault for not adequately maintaining the fences. And everybody's at fault for not accurately and carefully managing their cattle. Therefore, the Forest Service acted arbitrarily and capriciously in canceling Mr. Buckingham's grazing permit. Well, that, I don't think that. Is that it? Is that the argument? Well, no. That isn't the argument I'm making before this Court. The argument I'm making before this Court is if you look at the 2005 permit, it didn't have the terms to prescribe those areas. Your argument at base, I would analogize to the argument that even though I drive over the same stretch of roadway every day for a year and I know what the speed limit is, if the officer stops me for speeding but there's not a sign posted to tell me what the speed limit is, I can't be ticketed. Isn't that it? Well, it's analogous to that. It would be analogous to any type of criminal violation or civil violation that has specific elements, Your Honor. I mean, like, for example, if you take driving while intoxicated and you prove almost in my years of being a prosecutor, it was always the difficult element proving whether or not the defendant was intoxicated. But if I didn't ask the question to the policeman, did this occur within the city limits of Port Orchard? And if he didn't answer yes, I didn't prove the element, I lost the case even though he might have blown a 3-0. Those are criminal cases. I understand. This is a civil case. I understand. The standard of review is did the agency act in an arbitrary and capricious fashion in a course of dealing that spans almost 30 years? Well, I wouldn't look at it in that because we're not pressing that issue. We're pressing the 2005 permit issue. I know you want us to confine our review solely to the 2005, but as one of the issues, you bet. I understand that argument. But assume that I don't accept that argument and, as Judge Smith questioned you about, there is a course of dealing here that goes over many years. And so it's hard for me to accept the fact that Mr. Buckingham didn't understand that he wasn't supposed to have cattle grazing in areas where his cattle were consistently. And I would ask you in doing that, then, what is the course of dealing? And the Forest Service can't establish that in the context particularly of the 2005 permit. To make your argument succeed, wouldn't you need evidence that the Forest Service basically looked the other way, that even though the cattle had been in these improper pastures or allotments, that they just hadn't done anything about it? Not at all. You ask in the last set of oral argument, particularly in the, I believe in the 558C concept, you know, Mr. Turk, what would, what should they have done? In this case, I can answer that question. What they should have done in the context of the 558C notice is there were issues of fence maintenance and cattle in wrong areas from a number of people. The notice of noncompliance should have been written to not only Buckingham. It should have been written to Thomas. It should have been written to the adjacent permittees. And in that notice saying, listen, gentlemen or ladies, you better repair all these fences within this X time period. In the meantime, with dealing with these cattle that obviously can't stay in the same spot because you have failed to maintain, you're required to go out there on a daily or a bi-daily basis and remove it. And so their notice was entirely insufficient. Instead, it was focused on Mr. Buckingham, who the record reflects had repeated, repeated, I mean, in the last case you talk about, hey, they got on the phone. Well, Mr. Buckingham, the record is replete with Mr. Buckingham calling and writing and asking them to come out, look at this issue. I've got a problem out here. I can't solve it by myself. If I go out and maintain a fence that I'm not authorized to do, it's a violation of the law. So the Forest Service has got them coming and going, coming. You're over your argument time. Thank you. If at all possible, I'd appreciate a minute if you wouldn't mind. I'll have to think about it. That would be fine. Thank you very much. Thank you. Good morning, and may it please the Court and counsel, I'm Roger Wenthy, representing the Forest Service in the United States. Mr. Buckingham's grazing permit was terminated because he, his long-term behavior demonstrated that no lesser sanction would be effective. So what did he do this time that just sort of tipped the agency over the edge? It was repeated violations. Because he had had a number of repeated violations prior to this. And the Forest Service had, you know, for a long time had tolerated the situation, so. Hadn't tolerated it, Your Honor. Well, I mean, but they took some, they did take some steps. They cut back. What was it, 25 percent on one time? The concept of progressive discipline indicates that you try a sanction, you try suspension, then you try 25 percent reduction, and then you try another suspension. Let me ask you this. Counsel just argued very vigorously that, you know, that Mr. Buckingham tried to get the Forest Service folks to come out, assess the situation, tour the land, do whatever was necessary to try and work something out. And they apparently didn't go out. Is that right? We think the record is directly opposed to that point. He wanted to go with them. He wanted to meet them. I should point out, Your Honor, it's important that we all recognize that Mr. Buckingham does not raise in this appeal, with the possible exception of remedy, he does not raise the challenge to the decision on the grounds that it was arbitrary and capricious on its merits. He made that argument below and lost it. It's not raised here. It's just a series of legal issues. I'm just curious about how this all works. Well, he was, he was given the phone call. Because this is a pretty, you would agree, because you do agree that, you know, this permit is a very significant item for these cattle ranchers. Yes. Termination of permit is cancellation of permit. The ability to graze on the forest lands is important to them, right? We're not denying that. But on the other hand, it's also important for the Forest Service to maintain these lands so that they're there for future generations. Is that correct? Yes, Your Honor. And have to protect them from overgrazing, which is what happens when your cattle get into the wrong pastures. And that's a difficult argument for him to make. Because you tell people which pastures are permitted so that you can arrest other pastures. Now, he says that the 2005 permit didn't really actually, when it was modified, it didn't actually delineate. And Judge, you know, Judge Tallman really brought out that that's a difficult argument for him to make.  I'm sorry. I didn't contain a map. The annual operating instructions, which become part of the permit and are incorporated into it, specifically said the words, black ridge pasture, lye creek pasture, and the dates on which cattle could be on those pastures. And anybody who's grazing pastures in this area would understand where those pastures are located. Exactly. That's what the record shows. And not only that, but, of course, this Is the permit a contract? We're taking the position that it's not a contract, but that if there is ambiguity in its terms, that the courts have used contract principles to interpret it. And I think that's Like the Meadow case in the First Circuit. Yes. We cited that case in our brief. Well, do you think there's ambiguity in the permit? I'm simply saying I don't. I don't think that the words lye creek and black ridge are ambiguous in this permit. At least not to the parties. I mean, I wouldn't have any idea where black creek is or whatever, you know. But I guess to the parties, to this arrangement, they certainly would know, is that? The record fully supports that. Twenty years on this allotment of grazing, a person knows where the pastures are, and they haven't changed significantly. And are the boundaries to the pastures pretty well recognized? Boundaries are they are defined by the fences. The fence defines the pasture. That's what a pasture is. And the fences are defined by the fences.   And the fences are defined by the fence. So he says that, yes. We just heard this argument that, well, they should have come out then. They should have met with the other ranchers, and everybody should have gotten together because it was a problem that affected everybody. The fences were broken. That's his argument. Again, that would be a permissible argument if an arbitrary and capricious challenge were being made. It has no place here. And it was all raised and fully refuted below. And very lengthy decisions at the agency level were made disposing of those arguments. What property rights do ranchers have in these permits? Do ranchers? Ranchers. Well, we've taken the position simply for purposes of this discussion that an unexpired permit, which has time left on it, gives some degree of expectation to a person such that the due process clause affects it. Right. Right. That is a very limited situation. We're not talking about expired permits and then someone wants a renewal. We're not talking about initial application for a permit you never had. Right. But we're talking about somebody who has a permit. Yes. Somebody who has a permit that hasn't yet expired. One would have a reasonable expectation that that permit would continue until the end of the term. Exactly.  And so we acknowledge that for due process purposes. But then we go on with the remaining steps and show that. Now, is that the Forest Service's general position? I think the Forest Service would prefer it if – certainly it has always been their position that it is not property under the takings clause. And it has always been. Different inquiry. Yes, that's right. And I don't know that they've ever had, quite frankly, a situation exactly like this get litigated before where there is an unexpired term. I think all the other cases that have been out there have been cases where a person is applying for a permit they've never had yet or they're trying to get a renewal of a permit that's expired. And those are different situations. I think this may be an issue of First Amendment. So then the question is, well, what – well, so then there's different. Then there's also the statutory process that we were talking about in the preceding case. Right. And also the notice and ability to comply. Right. And he's given three second chances here. Right. He got notices in July, August, September, and was not canceled until November, we feel he had plenty of time and opportunity. Isn't the government's position that the plaintiffs did not exhaust their administrative remedy insofar as the uncertainty and vagueness of the contract or the permit? Yes. We're presenting the arguments in the alternative. But our primary argument is that they should have exhausted this issue. They did not. They never raised anywhere below or before the agency any concept that, okay, if you don't have a map attached, I don't have any obligations. I can graze my cattle wherever I please. That just was never made and could have been made and could have been raised. And so if we agree with you, then what happened? It doesn't get remanded. It's simply that by failing to exhaust it. It's unexhausted. I'm sorry? It's unexhausted. It's unexhausted and forfeited, yes. Right. And it's gone. But then they have their – then you go to their due process and constitutional due process arguments and their notice to comply and whatnot. Right. And we pointed out to you that we don't believe they are in the class of people or they don't represent a class of people for whom an in-person hearing with evidentiary protections and live witnesses and cross-examination is required. We pointed out to you that only two times in history has any – have there been any groups that get that kind of protection when losing an administrative benefit, and that's welfare beneficiaries and tribal health benefit beneficiaries. The group of people that do not get live hearings with witnesses under the due process clause include Social Security disability beneficiaries facing termination, utility customers facing shutoff, teachers facing termination, water rights holders facing loss of their rights, purchasers on a land contract facing the loss of their    I don't know. Do you know this hearing or post-notice hearing? Either one. Either one. All those groups were found to not require an in-person hearing with live witnesses before they were given their hearing. They have the opportunity to meet at the first level administrative review to meet with the district. They have the opportunity to present orally their argument, yes, at the first level. And they can be represented by counsel in that situation. They were. And they're entitled to. And, in fact, they can make any written submission they wish. And very lengthy written submissions were made, as you'll see in the administrative record. And then he issues a decision and they compel to a second level. That's right. And then that happened. And that happened. And that decision went against them as well. Okay. Thank you. Thank you. One minute. Not a second more. Thank you. I just want to speak on what the Forest Service tolerated. Because they inappropriately, under the law, spin the facts and the law erroneously in that under the rules, under their own rules under 36 CFR 222.3 per NC, the Forest Service issued a permit in 1983. It expired in 89. And under that rule, determined that he was in substantial compliance with the rules and reissued the permit. And then in 1999, his permit expired again. And in applying the same rule, determined he was in substantial compliance and issued a permit and renewed the permit again. And now, just before, in 2003 then, as a product of a prior decision-making process, they took action to the extent of 25 percent. So to the extent the Forest Service says they tolerated so much, their own rules have said that they believed he was, not believed, they found he was in substantial compliance. Thank you. Okay. Thank you. We've got a bonus. Ten seconds. Thank you very much, counsel. And the matter will be, we appreciate your arguments and the matter will be submitted.
judges: Paez, Tallman, M Smith, Cjj